UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10991-RGS

ANTHONY MCCARTY

v.

VERIZON NEW ENGLAND, INC.
and JEFFREY ROMANO

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

August 17, 2010

STEARNS, D.J.

        Plaintiff Anthony McCarty brought this lawsuit in Worcester Superior Court alleging common-law claims for intentional infliction of emotional distress (Count I), negligent infliction of emotional distress (Count II), trespass (Count III), and respondeat superior (Count IV) – all based on the allegedly abusive behavior of Jeffrey Romano, McCarty's supervisor at Verizon New England, Inc.  On June 10, 2009, Verizon removed the action to federal court under auspices of the Labor Management Relations Act (LMRA), 29 U.S.C. § 141, et seq., and the collective bargaining agreement (CBA) then in effect.  Defendants moved for summary judgment on March 23, 2010.[1]  A hearing was held on July 22, 2010.

BACKGROUND

        Although the parties differ in their characterization of events, the essential facts are not in dispute.  McCarty began working at Verizon on April 15, 1996, as a service technician at the Brook Street office in Worcester, Massachusetts, where he was responsible for installing and repairing telephone lines.  Verizon is a party to a CBA with

---

[1]The court will refer to defendants collectively as "Verizon".

Local 2325 of the International Brotherhood of Electrical Workers, of which McCarty was a member.   The CBA governed the terms and conditions of McCarty's employment, including hours, pay, performance evaluations, and employee conduct.

The CBA also contains a "Management Rights" clause which provides: "Subject only to the limitations in this Agreement the Company retains the exclusive right to manage its business including (but not limited to) the right to determine the methods and means by which its operations are to be carried on, to assign and direct the work force and to conduct its operations in a safe and effective manner." CBA § G11.01.   Under this clause, Verizon established a safety management program called Verizon Practices. The program requires Verizon's local managers to conduct unannounced work site visits.   This duty is also mandated in the local manager job description.   Local managers are also responsible for assisting employees in completing a Verizon accident form following any workplace injury.

Beginning in 2004, Romano became McCarty's local manager and supervisor. Romano's practice was to make unannounced visits on a monthly basis to observe each of his technicians at work.   In an effort to improve productivity, Romano visited underperforming employees more frequently.   McCarty fell consistently into this category. McCarty's previous supervisors had also expressed concern over his lack of productivity and would themselves occasionally make inspection visits at his work sites.[2] In 2004, Romano gave McCarty a "Does Not Meet Requirements" (DN) grade for his "Quality of Performance" during an annual review.   McCarty also ranked last in productivity among his sixteen-person work crew.   In 2005, McCarty received another DN from Romano for

---

[2]McCarty denied being "stressed out" from this earlier criticism and periodic observation.   ALJ Decision at 4.

"Quality of Performance" in his annual appraisal, as well as DNs in "Quantity/Productivity" and "Problem Solving/Decision Making."  He again ranked last in productivity among his co-workers.

Perceiving no improvement in McCarty's performance, Romano redoubled his inspection visits "up to several times per week" for a duration of "up to an hour."  Pl.'s Offer of Proof - Ex. 2 at 2.  McCarty also alleges that Romano often would follow him while he drove between worksites and page him for status updates on work orders.  Additionally, Romano scheduled extra meetings with underperforming employees like McCarty to "identify roadblocks and workable solutions that would help an employee achieve their goals."  Defs.' Statement of Facts (SOF) ¶ 9.  McCarty was called to "several" of these meetings.  Defs.' SOF ¶ 9.  McCarty considered the meetings to be a form of harassment by Romano, who was "hypercritical" and "unappreciative of [his] efforts and unique personality."  Pl.'s Offer of Proof - Ex. 2 at 1-2.

Psychiatric Treatment

In 2005, Romano's close supervision made McCarty so anxious that he took leave from work and sought medical attention.  On February 23, 2005, McCarty presented to Dr. Steven Hoffman, a psychiatrist.  His reported symptoms included insomnia, anxiety, daytime fatigue, stress, a decreased ability to concentrate, psychomotor slowing, and an increase in migraine headaches.  McCarty was diagnosed as having an acute stress disorder and generalized anxiety disorder.  For approximately four months, he remained on medical leave under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, et seq.  Dr. Hoffman did not prescribe psychiatric medications at McCarty's insistence.

3

McCarty's last visit with Dr. Hoffman during his FMLA leave was on May 28, 2005, at which time he reported improvement and was discharged from treatment.  McCarty returned to work at Verizon in the fall of 2005.

### History of Drug Use

During his treatment with Dr. Hoffman, McCarty disclosed a history of drug addiction. In 2002, while employed at Verizon, McCarty began using illicit narcotics, including morphine sulfate, OxyContin, and heroin.  Six months later, McCarty sought treatment at a methadone clinic.  McCarty has remained on methadone since, except for a three-month period when he was treated with a methadone substitute, Suboxone.  McCarty acknowledged one relapse for approximately two months in early 2005, when he abused prescription narcotics, but denied that his drug addiction had ever affected him at work.

### Workplace Driving Accident

On May 23, 2006, McCarty had an accident while driving his Verizon truck to his first job of the day.  Believing that Romano might be following him, McCarty checked his rear and side view mirrors before entering a highway on-ramp.  His attention diverted, McCarty drove into a Jersey barrier on the side of the on-ramp with sufficient force to be knocked unconscious.  McCarty regained consciousness at the scene and was then transported by ambulance to the emergency room at St. Vincent's Hospital in Worcester.  Hospital records indicate that McCarty disappeared for several hours after being admitted.  He was later found hunched on his knees in a hospital bathroom.  Doctors administered McCarty an anti-opiate medication.  After recovering, McCarty admitted to the treating staff that he had snorted heroin earlier that day.  After a six-hour observation period, McCarty was

interviewed by a social worker to whom he admitted "actively using heroin daily for several years." ALJ Decision at 6. McCarty's urine tested positive for opiates during a drug toxicology screen. McCarty was released in the early morning hours of May 24, 2006. The discharge instructions from the hospital indicate that McCarty was treated for a narcotic overdose.[3]

Aftermath of Workplace Accident

On May 24, 2006, McCarty called Romano and told him that he had been in a vehicle accident and would not be coming into work. The parties have differing accounts of whether McCarty phoned in over the ensuing week. On June 1, 2006, Romano came to McCarty's parents' home in Gardner, Massachusetts, where McCarty lived as a paying tenant. Romano's purpose was to obtain a completed Verizon workplace accident form from McCarty. Although Romano claims that he had made an appointment, McCarty denies it. The parties also disagree over what happened next. Romano claims that he was initially greeted by McCarty's mother, who told him to wait at the front door while she summoned McCarty from his room. At some point, McCarty's father came to the door. While it is undisputed that a heated argument broke out between the two men over whether Romano would be allowed to see McCarty, the parties disagree over who initiated the exchange. According to McCarty, after Romano became argumentative, his father told Romano that his son was not feeling well enough for a meeting. As the father moved to

---

[3]McCarty denies any drug use beyond Suboxone that day, but the workers' compensation hearing ALJ found McCarty lacking in overall credibility because of "major inconsistencies and discrepancies" in his version of events. ALJ Decision at 7. As McCarty's arguments rely on other portions of the ALJ's factual findings, the court finds it appropriate to accept the ALJ's findings of fact as a whole for purposes of this motion.

close the door, McCarty claims that Romano attempted to block the door with his boot, requiring his father to use force to bring the door shut.  Romano remained on the property, circling the house, peering in windows, yelling and gesturing to McCarty's father to come outside.  The father ordered Romano off the premises.  When Romano refused to oblige, McCarty's father called the Gardner police.  An officer responded and told Romano to leave.  Romano retreated to his truck, which was parked in front of the McCarty home, but did not leave until told to do so a second time by the officer.[4]

On August 30, 2006, Verizon terminated McCarty for violating its Code of Business Conduct, "specifically operating a company motor vehicle under the influence of a class 'A' substance."  Pl.'s Offer of Proof - Ex. 3.  McCarty filed a workers' compensation claim in the fall of 2006, citing the injuries he had sustained in the May 23, 2006 accident and the psychological harms allegedly stemming from Romano's harassment.  The Massachusetts Department of Industrial Accidents denied McCarty's claim on November 20, 2006.  On appeal, Administrative Law Judge (ALJ) Steven D. Rose held two hearings, the first on July 25, 2007, and a second on December 10, 2007.  On December 27, 2007, ALJ Rose issued a written decision rejecting McCarty's appeal.  Pl.'s SOF - Ex. 6.  The ALJ's decision was affirmed on appeal by the Massachusetts Appeals Court.  McCarty's Case, 2009 WL 3245454, at *1 (Mass. App. Ct. Oct. 13, 2009).  A separate workers' compensation claim filed by McCarty on May 5, 2009, based on the same facts as the first claim, was dismissed

---

[4]Romano claims that McCarty's father was the aggressor.  The ALJ, however, found the McCartys' version of the confrontation the more credible.  ALJ Decision at 10 ("The only legitimate, non-bona fide personnel action described by the employee was his supervisor showing up at his parents' home.  I find credible the employee's version of this incident whereby Mr. Romano arrived at the home without an appointment.").

as res judicata by a different ALJ on March 5, 2010.  Pl.'s SOF - Ex. 8. This Complaint, which was filed on May 13, 2009, seeks remedies in tort based again on the same cluster of facts.

DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Gaskell v. Harvard Coop. Soc'y, 3 F.3d 495, 497 (1st Cir. 1993), quoting Fed. R. Civ. P. 56(c).  "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." Id.  The nonmoving party "must adduce specific, provable facts demonstrating that there is a triable issue." Id. (internal quotation marks omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986) (emphases in original).  While the opponent is entitled to have his evidence taken as true, he "is not entitled to have the moving party's evidence positively disbelieved." Grubb v. KMS Patriots, L.P., 88 F.3d 1, 4 (1st Cir. 1996).

I.   Counts I and II: Intentional and Negligent Infliction of Emotional Distress

The tort of intentional infliction of emotional distress requires a plaintiff to show

7

(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

Agis v. Howard Johnson Co., 371 Mass. 140, 144-145 (1976) (internal quotation marks and citations omitted).  "The standard for making a claim of intentional infliction of emotional distress is very high."  Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996).  Whether a plaintiff has alleged facts sufficient to meet this standard is a question of law for the court.  "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so.  Hence, the second prong of the tort, that of assessing the extent and nature of the defendant's conduct, can be decided by the court without becoming a jury question."  Caputo v. Boston Edison Co., 924 F.2d 11, 14 (1st Cir. 1991) (internal citation omitted).

"[A] plaintiff in order to recover for negligently inflicted emotional distress must prove the following: (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case."  Payton v. Abbott Labs, 386 Mass. 540, 557 (1982).

a. Preemption and the LMRA

Section 301 of the LMRA confers federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an

industry affecting commerce."  29 U.S.C. § 185(a).  "[S]ection 301 preempts a state-law claim 'if the resolution of [that] claim depends on the meaning of a collective-bargaining agreement.'"  Flibotte v. Pa. Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997), quoting Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-406 (1988).  "A state-law claim can 'depend' on the 'meaning' of a collective bargaining agreement . . . . if its resolution arguably hinges upon an interpretation of the collective bargaining agreement."  Id., citing Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985).[5]

As to Count I, Verizon argues that "the Court cannot evaluate . . . McCarty's intentional infliction of emotional distress claim without construing the Management Rights clause of the [CBA] because the [CBA] delineates not only Defendants' intentions, but also whether Defendants conducted themselves in a sufficiently outrageous manner to give rise to liability under state tort law."  Defs.' Mem. at 7-8.  Similarly, as to Count II, Verizon maintains that "the Court cannot ascertain McCarty's negligent infliction of emotional distress claim without considering the Management Rights clause of the [CBA] because the [CBA] delineates the Defendants' general duty of care."  Id. at 8-9.  In response, McCarty argues that "there is no need to interpret the Management Rights clause in the [CBA] here because one only needs to look at the purely factual questions about Romano's conduct off of work premises . . . to determine if McCarty has viable claims for emotional distress."  Opp'n at 6-7.  Finally, McCarty argues that "there can be no possible legal validity to a

_____

[5]"[P]urely factual questions about an employee's conduct or an employer's conduct and motives do not require a court to interpret any term of a collective-bargaining agreement."  Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 261 (1994) (citation and internal quotation marks omitted).

clause which would give inference [sic] to the allowance of Romano's behavior here." Id. at 7.

The court agrees with Verizon that the management rights clause sweeps broadly enough to encompass the acts alleged against Romano.   Because this work-related behavior, whatever its propriety, falls within the scope of the CBA, the court is required to analyze the CBA's provisions.   It follows that McCarty's emotional distress claims are preempted by section 301 of the LMRA.   See Jackson v. Liquid Carbonic Corp., 863 F.2d 111, 120 (1st Cir. 1988) (finding section 301 preemption of an invasion of privacy suit because "the labor/management environment is dominated by a sweeping management rights clause.   We are not permitted to ignore a negotiated provision of a collective-bargaining agreement merely because of its familiarity or breadth.").

     b.  Exclusivity Provision of the Workers' Compensation Act

It is well settled law that actions for negligent and intentional infliction of emotional distress against an employer are barred by the exclusivity clause of the Workers' Compensation Act (WCA).   See Mass. Gen. Laws ch. 152, § 24 ("An employee shall be held to have waived his right of action at common law or under the law of any other jurisdiction in respect to an injury that is compensable under this chapter, to recover damages for personal injuries, if he shall not have given his employer, at the time of his contract of hire, written notice that he claimed such right . . . ."); Doe v. Purity Supreme, Inc., 422 Mass. 563, 566 (1996) (same, specifically referencing claims of negligent and intentional infliction of emotional distress).   The same is true of tort claims against a co-worker, including intentional torts.   "'A claim against a fellow worker for the commission of

an intentional tort will be barred by the exclusivity clause of the Workers' Compensation Act, G.L. c. 152, § 24, if committed within the course of the workers' employment and in furtherance of the employer's interest.'" Gibney v. Dykes, 2008 WL 2677143, at *1 (Mass. App. Ct. July 10, 2008), quoting Catalano v. First Essex Sav. Bank, 37 Mass. App. Ct. 377, 381 (1994).

Verizon argues that the entirety of Romano's alleged conduct was undertaken in furtherance of his employer's interest and any claims of resulting tortious harm are therefore barred by the WCA's exclusivity clause.  Verizon notes that all of Romano's visits to McCarty's job sites and his evaluations of McCarty's work performance fall within the scope of his managerial duties.  Verizon further argues that Romano's visit to McCarty's residence was justified by his mandate to insure that employees complete accident reports after suffering workplace injuries.  McCarty responds with a novel (and curious) argument that because his workers' compensation claim failed on its merits, he is no longer bound by the WCA's exclusivity clause.  (In detrimento asylum).  McCarty's argument relies on ALJ Rose's conclusion that it was impossible to attribute McCarty's emotional injuries to a single cause from among the effects of Romano's employment actions (poor performance reviews, unannounced work site visits, and observations of work), the shock of the motor vehicle accident, and the stress caused by Romano's visit to McCarty's residence.  See ALJ Decision at 10-11.  The ALJ's conclusion in this regard seems somewhat besides the point in light of his finding that Romano's disciplinary actions "were not 'harassment' as defined by [McCarty], but were instead legitimate business operations designed to deal with an underperforming employee."  ALJ Decision at 10.  Moreover, as the Appeals Court

11

found, "the June 1, 2006 [home visit] incident, which occurred only one week after [McCarty's] car accident, was part and parcel with the overall tenor of the employee's psychiatric claim based upon supervisor harassment." McCarty's Case, 2009 WL 3245454, at *1.   Thus, McCarty cannot dispute the fact that Romano's actions, whether justified or not, were undertaken in a supervisory capacity. (As a practical matter, for McCarty to claim otherwise would eliminate Verizon as a defendant).   Counts I and II are therefore barred by the exclusivity clause of the WCA.[6]

II.  Count III: Trespass

In Count III, McCarty brings a trespass claim related to Romano's visit to his parents' home on June 1, 2006.  "To sustain a claim for trespass a plaintiff must show (1) plaintiff's actual possession of the property at issue and (2) an intentional and illegal entry by defendant." Fed. Ins. Co. v. Boston Water and Sewer Comm'n, 583 F. Supp. 2d 225, 229

---

[6]In a footnote, Verizon also challenges McCarty's ability to meet the element of "outrageousness" required to satisfy Count I.  Verizon argues that "Romano's conduct of supervising his employee and checking up on him after a work-related accident is not so 'outrageous in character' or 'beyond all possible bounds of decency, . . . to be regarded as atrocious, and utterly intolerable in a civilized community.'" Defs.' Mem. at 8 n.2, citing Flibotte, 131 F.3d at 27.  McCarty argues that the outrageousness of Romano's conduct must be viewed in the context of the uninvited visit to his residence a week after he had been in a car accident and was ill, and the angry confrontation that resulted between Romano and McCarty's father.  In its worst light, Romano's behavior, however undignified, does not rise as a matter of law to the level of outrageous conduct contemplated by Supreme Judicial Court precedent.  See, e.g., Foley v. Polaroid Corp., 400 Mass. 82, 97-98, 100 (1987) (holding that it was not "extreme and outrageous" to station employee at a desk in a hallway for four months without any work and accuse him of raping a co-worker despite his acquittal).  Further, with respect to the June 1, 2006 confrontation, McCarty does not allege in his Complaint that he ever saw (or overheard) Romano at his parents' home that day.  (McCarty states for the first time in his Opposition that he "heard all of this and saw the enraged Romano stalking around the side of the house peering in windows and making gestures with his hands." Opp'n at 8-9. Accord McCarty Aff. ¶¶ 4-7).  The ALJ moreover has already found that whatever harm McCarty may have suffered cannot be shown to have been proximately caused by this incident.  ALJ Decision at 10-11.

(D. Mass. 2008), citing New England Box Co. v. C & R Constr. Co., 313 Mass. 696, 707

(1943).  Verizon challenges McCarty's ability to meet the actual possession element of

trespass because he neither owns the home nor manifested any intent to control it.  See

Restatement (Second) of Torts § 157 (1965).  McCarty responds that Verizon's argument

is contrary to settled law.  "[A]ny actual possession of real estate is sufficient to enable the

parties in possession to maintain an action against a stranger for interfering with that

possession and that everyone must be deemed a stranger who can show no title and no

older possession."  New England Box Co., 313 Mass. at 707.  "The action is founded

merely on the possession, and *it is not necessary for the plaintiff to show a right of

property*.  He must prove such a lawful possession of the land as the defendant has no

right to disturb; but any possession is a legal possession against a wrong-doer."

Barnstable v. Thacher, 44 Mass. 239, 242 (1841) (emphasis added).  Clearly, McCarty's

status as a tenant does not disqualify him from bringing a trespass claim.  Alternatively

(and more convincingly), Verizon argues that the trespass action fails to state a claim for

which relief can be granted because the damages McCarty seeks are inseparable from the

emotional distress claims barred by the WCA.  The Complaint alleges that "[a]s a result of

Defendant's trespass the Plaintiff was caused to sustain severe personal and emotional

distress, suffered great pain of body and mind and incurred medical and hospital

expenses."  Compl. ¶ 26.  The court agrees that the trespass claim merely dresses the

emotional distress claims in different garb, and fails for the same reasons.[7]

----

[7]The respondeat superior count (Count IV) does not state an independent cause of action, but rather a theory of liability holding an employer to account for the wrongful acts of its employees.  Because McCarty is unable to show any viable claim against Romano, any respondeat superior claim against Verizon necessarily fails as well.

III. Attorneys' Fees

Verizon argues that the Complaint "was filed without justification and [solely] to impose [a] burden on Defendants." Defs.' Mem. at 12. Because McCarty has had identical claims twice dismissed in the workers' compensation setting (and affirmed on appeal), Verizon alleges that this Complaint is frivolous and that reasonable attorneys' fees and costs should be awarded pursuant to Fed. R. Civ. P. 11.[8] Id. "[T]he central purpose of Rule 11 is to deter baseless filings in district court . . . . Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, *legally tenable*, and 'not interposed for any improper purpose.' An attorney who signs the paper without such a substantiated belief 'shall' be penalized by 'an appropriate sanction.' Such a sanction may . . . include payment of the other parties' expenses." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990) (emphasis added). As the Advisory Committee on the Federal Rules of Civil Procedure further elaborates: "The rule continues to require litigants to 'stop and think' before initially making legal or factual contentions. It also, however, emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable and by generally providing protection against sanctions if they withdraw or correct contentions after a potential violation is called to their attention." Fed.

---

[8]Although Verizon's memorandum framed its request for fees under Fed. R. Civ. P. 54, it made clear at the hearing that it actually seeks fees under Rule 11. This is a more appropriate request given the nature of the assertions in Verizon's memorandum. "Rule 54(d)(2) creates a procedure but not a right to recover attorney's fees." MRO Commc'ns, Inc. v. Am. Tel. & Tel. Co., 197 F.3d 1276, 1280 (9th Cir. 1999). McCarty, for his part, clearly understands Verizon's to be a Rule 11 request. See Opp'n at 15 ("McCarty's claims are all meritorious.").

R. Civ. P. 11 Advisory Committee's note.  A claim is frivolous under Rule 11 when it is "either not well-grounded in fact or unwarranted by existing law." Cruz v. Savage, 896 F.2d 626, 632 (1st Cir. 1990).  "[I]n making Rule 11 determinations, judges should not employ the wisdom of hindsight, but should consider the reasonableness of the attorney's conduct at the time the attorney acted." Id. at 633.  "However, a litigant's obligations with respect to the contents [of his filings] are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." Fed. R. Civ. P. 11 Advisory Committee's note.

The Court agrees that sanctions pursuant to Rule 11 may be warranted.  McCarty's attorneys were given notice of the factual and legal inadequacies of the Complaint by the two failed workers' compensation claims and the Appeal's Court's affirmance, all of which spoke directly to the inability of McCarty to prove that defendants' conduct proximately caused him any harm.  Undeterred by these adverse decisions, McCarty's attorneys (Ellis and Weiner) brought this suit in the Superior Court in an indigestible third bite at the apple. Verizon cited the LMRA preemption issue when it removed the suit to federal court.  Notice of Removal ¶ 4.  The WCA's exclusivity bar was flagged in Verizon's answer to the Complaint.  Answer at 5.  At the parties' Rule 16(b) scheduling conference on December 21, 2009, the court made it clear to another of McCarty's attorneys (Bopp) that it had serious reservations about whether this case should have been brought at all.[9]  Perhaps

---

[9]Attorney Bopp was terminated from the case on March 1, 2010.

realizing the potential hazards, McCarty's attorneys brought in a fourth attorney (Sanchez), who appears not to have been made aware of the court's cautionary advice.[10]

Verizon recommended at the hearing that any sanctions be levied against McCarty rather than his attorneys.  Rule 11 states that "the court may impose an appropriate sanction on any attorney, law firm, or *party* that violated [Rule 11(b)] or is responsible for the violation."  Fed. R. Civ. P. 11(c)(1) (emphasis added).  Nevertheless, "[c]ourts have generally declined to impose sanctions on represented parties."  Rentz v. Dynasty Apparel Indus., Inc., 556 F.3d 389, 398 (6th Cir. 2009), citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1336.2 (3d ed. 2004) ("Imposing a sanction on the client has met with disfavor.").  In the rare instances where courts have found it appropriate to sanction a client rather than an attorney, the client has been directly responsible for the unnecessary burden imposed on the court and the opposing party.  See Independent Fire Ins. Co. v. Lea, 979 F.2d 377, 379 (5th Cir. 1992) ("[T]he 'represented party' against which sanctions are levied must be a party who had some direct personal involvement in the management of the litigation and/or the decisions that resulted in the actions which the court finds improper under Rule 11.").  Usually, this has meant factually groundless pleadings where a party has clearly lied or misrepresented facts.  See Skidmore Energy,

---

[10]As an experienced attorney, Sanchez should have recognized the meritlessness of the case.  Sanchez argued at the hearing that he was merely fulfilling an attorney's role as a zealous advocate for his client.  An attorney's equally important role is that of a counselor, that is, one learned in the law and skilled in the giving of advice.  See Daniel R. Coquillette, The Anglo-American Legal Heritage 265-266 (1999).  See also Cruz, 896 F.2d at 634 ("[T]here is a point beyond which zeal becomes vexation, the 'novel' approach to a legal issue converts to frivolity and steadfast adherence to a position transforms to obdurateness. Here, [the plaintiff's attorney's] judgment was clouded by [his] excessive zeal to the point that [his] performance became unlawyerly.") (quoting the district court's opinion, 691 F. Supp. 549, 556 (D.P.R. 1998)).

Inc. v. KPMG, 455 F.3d 564, 568 (5th Cir. 2006); Union Planters Bank v. L&J Dev. Co., 115

F.3d 378, 384-385 (6th Cir. 1997).  Because legal arguments are within the discretion of

counsel, parties have not traditionally been held responsible when the frivolousness of a

suit is apparent from the theories advanced in its support.  See Fed. R. Civ. P. 11(c)(5)(A)

("The court must not impose a monetary sanction against a represented party for violating

Rule 11(b)(2) [frivolous legal argument].").  See also Skidmore Energy, 455 F.3d at 567-

568; Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc., 186 F.3d 157, 176-

177 (2d Cir. 1999); Barrett v. Tallon, 30 F.3d 1296, 1302-1303 (10th Cir. 1994).  But see

Lewin v. Cooke, 95 F. Supp. 2d 513, 527 (E.D. Va. 2000) (monetary sanctions awarded

against client in the "exceptional" circumstance where client was an attorney, actively

assisted his counsel, and brought suit for improper purpose to harass defendants).  Here,

although McCarty was undoubtedly aware of the outcome of his workers' compensation

claim when this action was brought, the court has been given no reason to believe that he

and not his attorneys was the puppet master of the current litigation (the portrayal of

McCarty's personality at the hearing and in the pleadings gives the idea a dubious aspect

at best).

ORDER

For the foregoing reasons, Verizon's motion for summary judgment is ALLOWED.

The Clerk will enter judgment for Verizon.  Verizon's counsel may file an application for an

award of reasonable attorneys' fees and costs within fourteen (14) days of the date of this

opinion.  Attorneys Ellis, Weiner, and Sanchez are ordered to show cause why they should

not be sanctioned for bringing frivolous claims in violation of Fed. R. Civ. P. 11(b)(2) within

17

twenty-one (21) days of the date of this order.  Verizon will have ten (10) days to submit a single reply not to exceed fifteen (15) pages.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE